UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/5/2018

------------------------------------------------------------X

JIMMY BEAUVOIR,                                   :

                     Plaintiff,        :

   -against-                                      :

                            :        14-cv-00669 (NSR)
                            :        MEMORANDUM DECISION
ROCKLAND COUNTY SHERIFF FALCO,    :
LT. BYRAN, SGT. MUELER, SGT. HICKEY,  :
C/O PEREZE, C/O LEVINE,                     :

                   Defendants.       :

------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

      Jimmy Beauvoir ("Plaintiff"), an incarcerated *pro se* litigant, commenced this action on January 30, 2014 against: Rockland County Sheriff Falco ("Falco"), Lieutenant Byran ("Byran"), Sergeant Mueler ("St. Mueller" or "Mueller") (incorrectly spelled in the caption as "Mueler"), Sergeant Hickey ("Hickey"), C/O Pereze ("Pereze"), C/O Levine ("Levine"), (collectively "Defendants"), pursuant to 42 U.S.C. § 1983. (*See* Amended Complaint ("AC"), ECF No. 29.) Plaintiff alleges that Defendants are liable for violating his Eighth Amendment right to be free from cruel and unusual punishments because they inflicted pain on him in a wanton, malicious, or sadistic way when they 1) sprayed him with pepper spray and 2) placed him in locked intake for two weeks, during which he allegedly spent several days without access to toiletries or a shower. (*See* Plaintiff's Letter dated 8/14/14, ("8/14/14 Letter"), ECF No. 29; Plaintiff's Letter Dated 10/23/17, ("10/23/17 Letter"), ECF No. 14.) Consequently, Plaintiff seeks $2.5 trillion in damages. (AC § V.)

      Presently before the Court is Defendant's Motion for Summary Judgment (Motion for Summary Judgment, ("Defendant's Motion"), ECF No. 110.) For the reasons discussed below, Defendants' Motion is GRANTED in its entirety.

## I.    BACKGROUND

The facts below are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.

### A.  Placement of Plaintiff on Suicide Watch

On June 1, 2013, Plaintiff was an incarcerated inmate at Rockland County Correctional Facility ("RCCF"). (Defendant's Rule 56.1 Statement ("Def. 56.1"), ¶ 2, ECF No. 110-27.) At around 3:05 pm, Plaintiff was in his cell, where he was observed upset and crying, with tears going down his cheeks. (*Id*. ¶ 4.)[1] RCCF Officer Puccio observed Plaintiff in this distressed and tearful condition and decided to place him on "suicide watch." (*Id*. ¶¶ 5-6; Defendants' Memorandum in Support of Summary Judgment ("Def. Mem."), Ex. D, ECF No. 110-10.).

Subsequently, Officer Puccio escorted Plaintiff to the Intake Booking area and ordered him to change into suicide watch apparel, pursuant to RCCF Policy. (Def. 56.1 ¶ 6; Def. Mem., Ex D; Surveillance Video, Ex. O, ECF No. 110-24.) Plaintiff, however, refused Officer Puccio's order to change into suicide watch apparel. (Def. 56.1 ¶ 7; Def. Mem., Ex D.) Plaintiff claims that he refused the orders because he told Officer Puccio that he was okay and that he did not want to hurt himself. (10/14/14 Letter.) ("I simply asked him if I can talk to the doctor or the chaplain so I wouldn't have to go on suicide so they can know that I don't want to hurt myself."). Plaintiff also claims that the reason he did not want to be placed on suicide watch was because he believed he would be placed in a very cold location and would get sick. (*See id*.) ("…its very cold I mean very

---

[1] Plaintiff claims that he was crying because as he was praying on his knees, he started to "tear up a bit." (*See* Letter dated 8/14/14, "10/14/14 Letter"), Ex. A, ECF No. 29.)

very cold on top of that I get sick very easy when I get to[o] cold[.] I start shaking then I'll end up at a hospital, so that's what I was trying to prevent.")

Nevertheless, after Plaintiff refused multiple orders from Officer Puccio, St. Mueller arrived to assist Officer Puccio (Def. Mem. Ex. D.)[2] When St. Mueller arrived, he also told Plaintiff to change apparel from the orange suit he was wearing to the blue suit that inmates are supposed to wear when on suicide watch. (Def. 56.1 ¶¶ 9-10; Def. Mem., Ex D.) Plaintiff continued refusing to change and became increasingly worked up. (Def. 56.1 ¶ 16; 8/14/14 Letter) ("…yes I did ask[] him a couple of times again to talk to the doctor and the chaplain maybe that's the reason he got so mad…"). Plaintiff claims that at this point Sergeant Mueller started cursing him out, told him to "shut the fuck up" and "spit on [his] face." (8/14/14 Letter.) Defendants claim that it was only Plaintiff who "became increasingly demonstrative and animated," whilst continually refusing to change into the suicide watch apparel. (Def. 56.1 ¶ 16.)

Subsequently, St. Mueller escorted Plaintiff to the shower area adjoining the intake area. (Def. 56.1 ¶ 17; Pl. Dep. 46: 9-14; Ex. O.) There, St. Mueller applied a burst of Oleoresin Capsicum ("OC" or "pepper") spray on Plaintiff. (Def. 56.1 ¶ 18; AC Attachment A; 10/14/14 Letter.) While Plaintiff claims that he subjectively thought St. Mueller was going to hit Plaintiff, the undisputed facts and surveillance footage reflect that both parties become increasingly agitated, but neither party became violent. (*See* 8/14/14 Letter; Surveillance Video, Ex. O.)

The parties disagree as to how much pepper spray St. Mueller emitted. Defendants claim that St. Mueller used the paper spray for a "short, one second burst," whereas Plaintiff contends that St. Mueller sprayed so much spray "to the point that everyone [was] [coughing] so much" and

---

[2] Plaintiff claims that Officer Puccio had already solicited Sergeant Mueller at the time when he first asked Plaintiff whether he was okay. (*See* 10/14/14 Letter.)

three other officers had to leave the room. (*See* 10/14/14 Letter; Ex. O).[3] Defendants claim that the surveillance video demonstrates that "[n]o staff demonstrated adverse reactions." (Def. 56.1 ¶ 19.)

After St. Mueller sprayed Plaintiff with the pepper spray, Plaintiff showered, put on fresh clothes, and was immediately escorted to the medical facility to irrigate his eyes. (Def. 56.1 ¶¶ 21-23; Pl. Dep. 55:17-18.) Plaintiff admits that he did not require any physical assistance to walk to the Nurse's office, but also claims that he could not open his eyes and was suffering from the immense pain. (Def. 56.1 ¶¶ 23; Pl. Dep. 56:2-3, 64:14-20.) ("I couldn't open my eyes. My eyes was watering and tears all over and it was red, it was hurt – it was hurting. And my head was also – I felt like my head was going to blow. My head hurt a lot.") The Nurse then provided Plaintiff with several fluids with which to rinse his eyes that Plaintiff then used to thoroughly rinse and irrigate his eyes. (Def. 56.1 ¶ 24; Pl. Dep. at 69-73.) Plaintiff then left the Nurse's office and was taken to a Psychiatrist. (Pl. Dep. 79:1-6.) The Psychiatrist examined Plaintiff and wrote a letter instructing Plaintiff to be taken "off suicide watch." (*See* Ex. D.)

Soon thereafter, Plaintiff entered a guilty plea and accepted 15 days of "lock-in" as a penalty for refusing to comply with corrections officer orders, and he was placed in Administrative Segregation for his refusal to comply with correctional officer orders. (Def. 56.1 ¶ 25; Ex D.) Plaintiff claims that before he was placed in this segregation, Defendants wrongfully took away all his legal papers, his bible, his clothes, all the food he had brought with him (10/14/14 Letter.) ("they took everything I had owned and put it in the trash.") At some point on June 1, 2013, St. Mueller properly filled out an OC Report, detailing the incident and his use of OC spray on Plaintiff. (Def. 56.1 ¶ 26; Ex. D.)

---

[3] Plaintiff claims that St. Mueller first chided him about knowing what pepper spray was and then held the blue suicide watch suit with his left hand, whilst operating the pepper spray from his right hand. (Plaintiff Deposition, Defendants Motion for Summary Judgment, Ex. C at 47, ECF No. 110-7-9.) Plaintiff also claims that St. Mueller was "so close to my face, his fingers was touching my nose while he sprayed me with the thing." (*Id.*)

### B. Plaintiff's Attempt to File a Grievance

About five months later, on November 15, 2013, Plaintiff submitted a grievance in connection with the June 1, 2013 pepper spray incident, in which Plaintiff claimed to have suffered injuries to his eyes, including losing sight in his right eye, getting blurry vision in his left eye, and having to get scheduled for a surgery as a result of exposure to the spray. (Def. 56.1 ¶ 27; Ex. D.).[4] But the same day that Plaintiff filed this grievance, Lt. John Byran, the Grievance Coordinator at RCCF, denied Plaintiff's application. (Def. 56.1 ¶ 28; Ex. D.).

Plaintiff appealed the initial determination of the Grievance Coordinator to the Chief Administrative Officer. (Def. 56.1 ¶ 29; Ex. D.). Subsequently, on November 25, 2013, the Chief of Correction, Anthony Volpe, rendered a decision, in which he denied Plaintiff's Grievance. (Def. 56.1 ¶¶ 30-31; Ex. D.). Plaintiff then appealed this decision to the Citizen's Policy and Complaint Review Council, and the appeal was sent to the Council on November 29, 2013. (Def. 56.1 ¶¶ 33-34; Ex. D.). On February 19, 2014, the Citizen's Policy and Complaint Review Council rendered a final decision, sustaining the action taken by the facility administration. (Def. 56.1 ¶ 35; Ex. D.).

### C. Plaintiff's Chronic Eye Conditions and Medical History

Plaintiff has a documented history of chronic inflammatory changes in his peripheral cornea that date back to 2004. (Def. 56.1 ¶ 35; Ex. F, L.). This history reflects that Plaintiff had chronic conjunctivitis with corneal changes, and an assessment and plan of corneal superficial vascularization. (Def. 56.1 ¶ 37; Ex. F.) On March 3, 2004, Plaintiff was treated at New York Presbyterian Hospital for an evaluation of superficial corneal vascularization and was noted with

---

[4] "I cannot see from my right eye ever since I got spra[yed] with pepper spray. I'm blind from my right eye so now my left eye is beginning to get blurry and blurry. I have been taken to the doctor many times. Nothing is working so now they talking about having a surgery very soon now that I'm blind on one eye because somebody was being who they are and did this to me for no reason." (Def. Decl., Ex. D.)

vision of 20/25, 20/30 with superficial pannus and anterior corneal inflammation on examination, with an assessment of corneal inflammation/pannus/pigmentation. (Def. 56.1 ¶ 38; Ex. F.)

Although he was advised to follow up in two months, Plaintiff next went to New York Presbyterian Hospital on March 31, 2005 with complaints of itchiness and inflammation and increased pannus. (Def. 56.1 ¶ 44; Ex. F.) During that visit, the doctor noted that Plaintiff had superficial pannus and corneal thinning. (Def. 56.1 ¶ 45; Ex. F.)

On September 1, 2005, Plaintiff was again treated at New York Presbyterian and had a vision of 20/25 and pannus. (Def. 56.1 ¶ 46; Ex. F.) Subsequently, on January 19, 2006, Plaintiff was again treated at New York Presbyterian Hospital and this time was noted with having pannus in both eyes, being "inactive," and was directed to follow up in three months. (Def. 56.1 ¶ 47; Ex. F.) Although Plaintiff was advised to follow up in three months, he did not, and his next treatment at New York Presbytarian was on January 4, 2007, where he was noted as having asymptomatic pannus and vision 20/25, 20/30. (Def. 56.1 ¶ 48; Ex. F.)

On June 21, 2007, Plaintiff was treated at New York Presbyterian again. This time, the doctor noted that he had clumps of white infiltrates with staining in his right eye, and assessed it as pannus with inflammation, secondary to atopic disease. He was advised to follow up in two weeks. (Def. 56.1 ¶ 49; Ex. F.)

Plaintiff was next treated at New York Presbyterian Hospital on December 20, 2007 and was noted as having white infiltrates bilaterally with staining and atopic disease with pannus; he was advised to follow up in two to three months (Def. 56.1 ¶ 50; Ex. F.) Plaintiff was next treated at New York Presbyterian Hospital on October 7, 2009 and noted with blurry vision in his right eye and diplopia (double vision) in his left eye for approximately one year, mild chemosis

(swelling of conjunctiva), epithelial infiltrates and pannus worse since 2007, and was directed to follow up in two to three weeks (Def. 56.1 ¶ 51; Ex. F.)

On June 21, 2010, Plaintiff was treated at New York Presbyterian Hospital for chronic pannus secondary to atopic disease. (Def. 56.1 ¶ 52; Ex. F.) On June 24, 2010, Plaintiff was treated at New York Presbyterian Hospital with worsening pannus of the left eye, neovascularization of the cornea (worse in right eye), opacification, and chemosis. (Def. 56.1 ¶ 53; Ex. F.) On July 29, 2010, Plaintiff was treated at New York Presbyterian Hospital and noted with a vision of 20/50 (right) and 20/30 (left), phlyctenules worse in the right eye, neovascularization, pannus with corneal haze worse in the right eye, persistent irritation and redness. (Def. 56.1 ¶ 54; Ex. F.)

On August 9, 2010, Plaintiff was treated at the Rockland County Department of Health at the immunotherapy clinic for his complaints of daily headaches and right eye redness (Def. 56.1 ¶ 55; Ex. F.) On November 2, 2010, Plaintiff was treated at the Rockland County Department of Health with complaints of right eye redness. (Def. 56.1 ¶ 56; Ex. F.) On June 1, 2011, Plaintiff was treated at New York Presbyterian Hospital with noted redness, itchiness, and pain in both eyes, vision 20/200 (right) and 20/40 (left). (Def. 56.1 ¶ 57; Ex. F.)  In this visit, the doctor's notes reflect that Plaintiff was supposed to be on Patanol, Tobradex, and Doxy, but he only last followed up in July 2010 (*Id.*)

Based on an exam taken during Plaintiff's June 1, 2011 visit, Plaintiff was noted with, *inter alia,* pannus with stromal vessels, phlyctenules and corneal haze *worse in the right eye* (Def. 56.1 ¶ 58; Ex. F.) Again, the June 1, 2011 medical chart notes that Plaintiff was noncompliant with follow-up or treatment, and there was a possible need to rescrape his right cornea—that is, a need for Plaintiff to have surgery on his right eye. (Def. 56.1 ¶ 59; Ex. F.) On June 2, 2011, Plaintiff was treated at New York Presbyterian Hospital again, and this time

was noted with vision 20/80 (right) and 20/40 (left) (Def. 56.1 ¶ 60; Ex. F.) The chart from that visit notes that Plaintiff needed to exercise strict compliance with treatment, follow-up, and medicine, in order to avoid severe visual loss, and he was advised to follow up in two weeks (Def. 56.1 ¶ 61; Ex. F.) The notes also stated "may need to rescrape cornea OD" (Ex. F.) On April 30, 2012, Plaintiff was again treated at New York Presbyterian Hospital for his complaints of eye redness, pulsating, and having blurry vision and itching for two to three months; he was also noted with vision of 20/300 (right) and 20/30 (left) (Def. 56.1 ¶ 62; Ex. F.)

On June 19, 2012, Plaintiff was treated at the Rockland County Department of Health and had complaints of blurred vision (Def. 56.1 ¶ 63; Ex. F.) On July 20, 2012, Plaintiff was treated at New York Presbyterian Hospital, with vision readings of 20/125 (right) and 20/30 (left). (Def. 56.1 ¶ 64; Ex. F.) He was also noted to have not been using any eye drops (*Id.*) The chart from this visit also reflects that he had right pannus with stromal vessels and phlyctenules, neovascularization/pannus with corneal haze *worse than the left*. (Def. 56.1 ¶ 65; Ex. F.) Finally, the chart from this visit also notes that Plaintiff now presented himself with fully vascularized (superficial) cornea in the right eye with potential need to rescrape the cornea—so again at this point, Plaintiff was considered a candidate for eye surgery. (Def. 56.1 ¶ 66; Ex. F.)

The July 20, 2012 New York Presbyterian Hospital medical chart notes indicate that Plaintiff had a history of non-compliance with follow-up and treatment (Def. 56.1 ¶ 67; Ex. F.) On August 31, 2012, Plaintiff was treated at Nyack Hospital and displayed mild scleraicterus in his eyes on examination. (Def. 56.1 ¶ 68; Ex. F.) On October 4, 2012, Plaintiff was treated at New York Presbyterian Hospital and was noted for a history of chronic stromal

vascularization, thinning, and inflammation in both eyes, but worse in the right. (Def. 56.1 ¶ 69; Ex. F.)

The October 4, 2012 New York Presbyterian Hospital medical chart notes show an assessment and plan reflecting chronic pannus, scarring and thinning associated with atopic conjunctivitis, fully vascularized (superficial) and scarred cornea in the right eye with diffuse thinning and was advised to follow up in four weeks (Def. 56.1 ¶ 70; Ex. F.) On April 23, 2013, Plaintiff was treated at the Rockland County Correctional Facility and was noted with a history of pannus (Def. 56.1 ¶ 71; Ex. F.)

On June 1, 2013, Plaintiff was treated by a nurse at RCCF and was given an eye flush following the OC spray incident (Def. 56.1 ¶ 72; Ex. C.) About one year later, on May 21, 2014, Plaintiff underwent surgery to his right retina, specifically a keratoplasty and limbal vessel cautery of the right eye. (Def. 56.1 ¶ 73; Ex. J.)

## II.    STANDARDS OF REVIEW

### A.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden,

the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

When dealing with summary judgment motions in *pro se* cases, courts in this Circuit must "read the pleadings of a *pro se* plaintiff liberally and "raise the strongest arguments that they suggest" *McPherson v. Coombe*, 17 F.3d 276 (2d Cir. 1999) (*quoting Burgos v. Hopkins*, 214 F.3d 787, 790 (2d. Cir. 1994). Pleadings drafted by *pro se* plaintiffs moving for summary judgment are not held to the same "stringent standards" as "formal pleadings drafted by lawyers." *Shariff v. Poole*, 689 F.Supp.2d 470, 476 (S.D.N.Y. January 20, 2010). On the other hand, *pro se* plaintiffs cannot overcome a motion for summary judgment by simply making "bald" assertions that are unsupported by the evidence. (*Id.*)

### B. Section 1983 Actions

Section 1983 provides, in relevant part, that:"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09 Civ. 5446, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of

his federal statutory rights, or his constitutional rights or privileges. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (noting that Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution") (citation omitted).

### C. Eighth Amendment and Excessive Force

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Therefore, the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions." *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463, 183 L. Ed. 2d 407 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1189, 161 L. Ed. 2d 1 (2005). The right emanates from the basic precept of justice that punishment for crime should be graduated and proportioned to [the] offense. *Roper*, 543 U.S. at 560 (citations and internal quotations omitted). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Id*.

Excessive use of force under Eighth Amendment of the U.S. Constitution and requires courts to engage in a two-part inquiry, one objective and the other subjective. The subjective inquiry focuses on the defendant's motive and the objective inquiry on the conduct's effect. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009). First, under the subjective test, a prisoner must show that the defendant acted with a "sufficiently culpable state of mind." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In other words, a plaintiff must show that the defendant acted with "wantonness in light of the particular circumstances surrounding the challenged conduct." (*Wright*, 554 F.3d at 268 (citation omitted)). Wantonness asks "whether the force was used in a good-faith effort to maintain or restore discipline, or

maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7; *Scott v. Coughlin*, 344 F.3d 282, 291(2d. Cir. 2003). It is a test about necessity, intent, effect, and proportionality. Hence, to determine whether Defendants acted maliciously or wantonly, a court must examine: the extent of the injury; the mental state of the Defendant; "the need for the application of the force; the correlation between that need and the amount of the force used; the threat reasonably perceived by the Defendants, and any efforts made by the Defendants to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7.

Next, under the objective test for cruel and unusual punishment, courts look at the harm done, in light of "contemporary standards of decency." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Courts have stated, however, that in the excessive force context, there is essentially strict liability. *Id*. at 9 ("In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated."). On the other hand, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 9.) Furthermore, while the nature of the injury can provide evidence of the use force, injuries alone are not dispositive. *Id*. at 38 ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

## III.  DISCUSSION

### A.  Eighth Amendment Claims

Plaintiff claims that he was subject to cruel and unusual punishment, in violation of his Eighth Amendment rights, when St. Mueller sprayed him with pepper spray in reaction to

Plaintiff's protests against changing into the blue clothing required to for being on suicide watch. (Supplemental Opposition to Defendant's Motion for Summary Judgment, ("11/2/2018 Letter"), ECF No. 14.) Plaintiff claims that this was "unnecessary and wanton infliction of pain" and an abuse of incarcerated individuals because all Plaintiff did was ask questions regarding "the process which the officer or staff is trying to propose." (*Id.*). Again, Plaintiff contends that this incident has blinded him and caused him to need eye surgery. ("I cannot see from my right eye ever since I got spra[yed] with pepper spray. I'm blind from my right eye so now my left eye is beginning to get blurry and blurry. I have been taken to the doctor many times. Nothing is working so now they talking about having a surgery very soon...") (Def. Decl., Ex. D.)

Plaintiff also argues that he was deprived of his Eighth Amendment rights when he was subsequently locked in intake for fourteen days because in the first four or five of those days, he was left "with no recreation, no shower, no toothbrush, [and] no toilet paper." (8/14/14 Letter.) The Court turns first to the pepper spray incident and then to the lock-in incident.

### 1. Pepper Spray Incident

The Court assesses both the subjective and objective tests that are necessary for finding an Eighth Amendment violation. It begins with the subjective test.

### a. Subjective Test

Since the subjective test helps courts assess motive, the Court first notes that negligence does not rise to the level of an Eight Amendment constitutional violation. Rather, the Supreme Court has explained that the Eight Amendment violation occurs when a prison official demonstrates "'deliberate indifference'" to a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S. Ct. 1970, 1982 (1994)). This standard "entails something more than negligence, but is satisfied by something less than acts on omissions for the very purpose of

causing harm." *Id*. at 826. (emphasis added.) Consequently, a defendant's conduct must reveal an element of *intention* or *recklessness*. *Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) ("any § 1983 claim for a violation of due process requires proof of mens rea greater than mere negligence"; it must be shown that an official "acted intentionally or recklessly.")

### *i.* *Extent of Injury*

The Court begins with the extent of Plaintiff's injury. Again, the importance of this factor at this stage is not to assess the objective cruelty of Defendant's conduct, but to see what, if anything, it reveals about Defendant's intent.

Plaintiff claims that he went blind and had to get surgery due to the use of pepper spray on his eyes. (AC § III) ("I went blind from getting mist, and they did take me to Nyack Hospital, but nothing was result, until May 21, 2014. I had a surgery and now I am in really bad condition right now. It can take me days just to write a letter.") Defendants do not dispute that Plaintiff is blind in his right eye and required having retinal surgery. Rather, they dispute that Plaintiff's injury is attributable to the pepper spray incident since Plaintiff has a long medical history of poor vision and was already legally blind and in need of retinal surgery more than a year before the pepper spray incident. (Def. Mem. at 25-27.)

The Court agrees with Defendants' assessment. Although, losing vision and needing and eye surgery are certainly sufficient to show an extensive injury, the injury has to be causally related to the application of excessive force to make a successful excessive force claim. *See Ajamu Olutosin v. William Lee*, Case No. 14-cv-00685, ECF No. 151 (S.D.N.Y. October 11, 2018) (NSR) (rejecting claim that retinal detachment of inmate was the result of excessive force where two physicians provided undisputed expert testimony reflecting that Plaintiff had a previous history of

retinal detachment and a need for surgical intervention that was neither caused by nor aggravated by the use of force incident in prison.)

Here, similar to the situation in *Olutosin*, Defendants presented the expert testimony of Dr. Stamm, a licensed physician and Board Certified ophthalmologist, who testified with a reasonable degree of medical certainty that "plaintiff's corneal disease was not proximately caused by plaintiff's exposure to pepper spray" and that "plaintiff's corneal transplant surgery was not necessitated by plaintiff's exposure to pepper spray on June 1, 2013, but instead was the byproduct of the progression of plaintiff's documented history of chronic inflammatory changes of the peripheral cornea dating back to 2004." (Mark Stamm Expert Affidavit, Ex. L, ECF No, 110-21.)

Upon reviewing all of Plaintiff's medical records, Dr. Stamm further concluded:

- "Plaintiff suffered from chronic eye problems since at least the year 2004, which presented as chronic inflammatory changes of the peripheral cornea, the changes have progressed over time to the point that the vision in Plaintiff's right eye was at the level of less than 20/200 prior to June of 2011, which was legally blind." (*Id*.)

- "In April 2012, more than one year prior to the pepper spray incident, Plaintiff was noted by his doctors, as having significant corneal disease in his right eye with pannus formation, deep stromal blood vessels, and stromal thinning. At that point, he already was not able to be refracted to a better vision." (*Id*.)

- "In addition, Plaintiff's medical records indicate that Plaintiff was noncompliant with both follow-up and treatment from 2004 to 2011." (*Id*.)

- "Consequently, Plaintiff had a very significant corneal disease prior to June 1, 2013, which necessarily required a corneal transplant to visually rehabilitate his eye." (*Id*.)

- "Neither Plaintiff's vision impairment, nor his need for corneal transplant surgery were proximately caused by Plaintiff's exposure to pepper spray on June 1, 2013." (*Id.*)

Similarly, Defendants' provided Plaintiff's entire medical history for his eyes, which unequivocally reflected that he had severe eye issues since as early as 2004, nearly a full decade before the pepper spray incident. For example, the notes from a doctor's visit on February 24, 2004 reflect that Plaintiff was HIV-positive since he was 14 years old and had chronic conjunctivitis with corneal changes, and an assessment and plan of corneal superficial vascularization since he was 18 years old. (Doctor's Report from 2/27/04 visit, Ex. F.) Similarly, the notes from a doctor's visit at New York State Presbyterian on July 20, 2012 reflect that Plaintiff had "chronic pannus" (*i.e.* a film forming on his eyes) and that the right eye was already in considerably worse shape than his left eye. (Doctor's Report from 7/20/12 visit, Ex. F) He was also reported as not going to any of his follow up appointments for over a year (*Id.*) ("h/o noncompliant with follow-up or treatment"; "not using any eyedrops.") Moreover, his vision was reported as a debilitating "20/300" in his right eye, indicating that he was already legally blind.

Additionally, on at least two documented occasions before the pepper spray incident, Plaintiff was considered likely to need future retinal surgery in his right eye. (*See* June 1, 2011 and July 10, 2012 Medical Notes, Def. 56.1 ¶ 59; Ex. F.) ("may need to rescrape cornea/PKP OD"; "may need to rescrape cornea OD but will defer to cornea clinic.") And finally, Plaintiff was complaining about his headaches, right eye redness, itchiness, and pain in both eyes well over a year before the pepper spray incident. (*See supra* Part I.C.) ("On August 9, 2010, Plaintiff was treated at the Rockland County Department of Health at the immunotherapy clinic for his complaints of daily headaches and right eye redness…On November 2, 2010, Plaintiff was treated at the Rockland County Department of Health with complaints of right eye redness…On June 1, 2011, Plaintiff

was treated at New York Presbyterian Hospital with noted redness, itchiness, and pain in both eyes.")

Consequently, although Plaintiff's vision loss and subsequent surgery would otherwise suffice as an extensive injury, here the Court finds that Plaintiff's injury had nothing to do with the use of force incident and was neither caused nor significantly exacerbated by the pepper spray.

The only additional injuries that Plaintiff has alleged are minor injuries related to pain in his eyes, his body, and head. For example, Plaintiff claims he suffered increased pain and burning to his eyes *several months* later. (*See* 10/14/14 Letter) ("A few months after the whole thing happen, I started feeling weird. I was in a lot of pain, my eyes was blood shot red and burning… the side of my face was hurting, my eyes was in bad shape, it was burning and hurting.") Those claims suffer a lack of any corroborating evidence, but more importantly, suffer the same causation issues as Plaintiff's loss of vision and retinal surgery claims—that is, Plaintiff had already made those *exact* complaints on numerous occasions prior to the pepper spray incident, and there are no facts on the record to allow a jury to conclude that those complaints of pain many months later had any causal relationship to the use of force incident.

Critically, nowhere in Plaintiff's Complaint does he complain of suffering any immediate pain or injury right after the pepper spray incident. (*See* AC.) This is corroborated by Defendants' video surveillance footage. While Defendants' video surveillance footage does not depict what occurred in the shower stall when St. Mueller actually sprayed Plaintiff, the video does show that within moments of the incident, Plaintiff emerges from the shower and walks out of the hallway with no visible signs of pain or visual loss. He is not hunched over, he is not limping, he is not veering off in the wrong direction, he is not grabbing his eyes, and he is not even coughing. (*See* Ex. O.) This is corroborated by Plaintiff's conduct in the Nurse's office. Even though Plaintiff

testified that he was experiencing pain immediately after the incident, when he was at the Nurse's office, he did not once complain about any pain or suffering to the Nurse. (Pl. Dep. at 69-76.)[5]

Accordingly, based on a thorough review of all the evidence on the record including Plaintiff's deposition, the video surveillance footage, Plaintiff's medical history, and Dr. Stamm's expert report, the Court finds that Plaintiff's injuries from the force incident are very minor indications of a malicious or deliberately indifferent intent. Therefore, this factor weighs in Defendants' favor.

### ii. *Mental State of Defendant*

This factor goes to the core of the excessive force inquiry. Courts must assess the facts on the record to determine "whether force was applied in a good faith effort to maintain or restore discipline," or whether there were ulterior motives driving the use of force. *Hudson*, 503. U.S. at 7. To survive summary judgment, a Plaintiff must make some showing to indicate that Defendants acted "maliciously and sadistically," intending to cause harm. *Perry v. Stephens*, 659 F. Supp. 2d 577, 581 (S.D.N.Y. 2009) ("The subjective element requires that the prison official involved possess a "wanton" state of mind when he or she engaged in the alleged conduct.") (citing *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). In other words, because Eighth Amendment excessive force issues do not hinge on whether there was grave injury, but on whether officers

---

[5] In his deposition, Plaintiff did testify that right after being sprayed "I was bending down and I couldn't breathe and then I kneeled down after. And I was still—you know, I felt like I was going to pass out or something, you know, it was just pain all over. And for some reason when they sprayed the pepper spray it stayed in the air. So every time I move or turn around its get on my body, also, and it hurts a lot."(Pl. Dep. 51: 6-14.) But, the Court has pointed out that there is not one piece of corroborating evidence for this statement. There is nothing in Plaintiff's complaint, the video surveillance, or the Nurse's report. Accordingly, the Plaintiff's deposition testimony is simply self-serving testimony that cannot be used to defeat summary judgment. *See Fincher v. Depository Trust & Clearing Corp.,* No. 06 Cv. 9959(WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir.2010) ("[a nonmoving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.").

inflicted *unnecessary* pain and suffering that can be deemed cruel and unusual *punishment*, this factor directly looks for proof of intent.

Here, Plaintiff only provides scattered statements that could go to mental state of St. Mueller and one or two unknown officer. For example, Plaintiff claims that prior to spraying pepper spray, St. Mueller said things such as "shut the f** up" and "get you're a** in the shower." (AC, Attachment A.) Plaintiff also claims that St. Mueller "pulled out his pepper spray asking me if I knew what it was" and adds that St. Mueller "was getting so mad I thought he was going to hit me."(*Id*.) Plaintiff vaguely states that "Sgt. Mueler had two other C/Os with him [which] made me more afraid" and later claims "Sgt. Mueler was so close to my face to the point that his hand was touching my face." (*Id*.) Subsequently, Plaintiff adds that St. Mueller made him take a shower with cold water. (*Id*.)

The Court first notes that much of Plaintiff's testimony is uncorroborated by any evidence, and, apart from being self-serving testimony that is insufficient to defeat summary judgment, it is belied by the video evidence. The surveillance video does not depict any yelling or violence, just marginally aggressive dialogue exchange. (*See* Ex. O). Even if Plaintiff's allegations were taken as true as to St. Mueller's conduct in the shower stall, which was not fully visible on the surveillance footage, it does not rise to a level of sadistic or malevolent conduct. Rather, it constitutes *de minimus* use of physical force, which is occasionally permissible. The Eight Amendment does not prohibit all uses of force that could be avoided or all malevolent touch that may seem unwarranted. *Hudson*, 503 U.S. at 9-10. It proscribes punishment that is deemed torturous and barbarous, *id*. (citing *Estelle*, 429 U.S. at 102), or "repugnant to conscience of mankind." *Hudson*, 503. U.S. at 10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327, 106 S. Ct. 1078, 1088 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 348–349 & 348 n. 13, 101 S. Ct. 2392, 2400,

(recognizing that not every deviation from an "aspiration toward an ideal environment for long-term confinement" amounts to a constitutional violation); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("…not even "every malevolent touch by a prison guard gives rise to a federal cause of action.") Accordingly, this factor also weighs in favor of Defendants.

### iii. <u>Need for the Application of Force</u>

To assess Defendants' motive from the perspective of necessity, it is again helpful to look at the Supreme Court's foundational guidance. The Supreme Court explained the relationship between infliction of excessive force and the legitimate need for prison guards use for to keep order in *Hudson*:

> Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmate. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve the internal order and discipline and to maintain institutional security.

(*Hudson*, 503 U.S. at 6) (internal quotation marks omitted.) Hence, the Court recognized that a prison or a correctional facility is a nuanced setting, where order must be maintained and riots and disturbances need to be quelled. Consequently, it pardoned, to a degree, uses of force that might seem unnecessary in day-to-day civilian life, so long as the force was tethered to the legitimate need to maintain order in prisons. *Id*. at 10. ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033, *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462 (1973.))

Weighing these competing interests, the Court finds that whilst St. Mueller's use of the pepper spray may not have been strictly necessary, as Plaintiff was not behaving belligerently or

threateningly, (*see infra* Part III.A.1.a.v.), but it was permissible in the context of needing to maintain a baseline of order in the prison system. For example, the undisputed facts reflect that Plaintiff repeatedly resisted multiple officers' orders. (*See* Video Surveillance, Ex. O) (showing that Plaintiff is being offered a blue uniform multiple times that he is declining to take and wear); (*See* Pl. Dep. at 46: 15-23) ("I was just trying to make sure that he understood where I was coming from too. I said lease, please, you know, please, please, please Sergeant Mueller, let me speak to the doctor, please."); (*See* AC, Att. A) ("I said wait can I talk to the doctor or the chaplain so they can know that I don't want to hurt myself"); (*See supra* Part I.A.) ("…yes I did ask[] him a couple of times again to talk to the doctor and the chaplain maybe that's the reason he got so mad.")

They also reflect that Plaintiff adamantly *believed* that he had the right to first consult the Nurse and Psychiatrist before being sent to suicide watch. (*See* Pl. Dep. 59-63) (Q: "do you know of any rule or regulation in the jail, the Rockland County Jail, that would permit you to refuse to comply with a directive by a guard or an officer if you disagree with it? A: Yes. Q: And what rule is that and what regulation is that? A: Well, I don't know the name of the rules, but I know once you disobey a direct order, they are allowed to write you a ticket, but not try to hurt you… Q: But you don't know what the rule name or number is, regulation number is? A: No, sir, because I never had a rule book, to be honest…Q: Do you know how you know that about the rule you were just talking about, the regulation? A: No, because there are other inmates that have been in for, you know, years, months, say the same thing….Q: Is this just your understanding from having spoken with other inmates? A: inmates in the law library")

Apart from conclusory references to inmates and a rule book, Plaintiff neither provides nor references any credible source of factual information that could lead a jury to believe that Plaintiff in fact *had* the right to resist officer orders or that he or was *lead to believe* that he had had that right

22

by a source with authority. In contrast, Defendants have provided excerpts from New York State Corrections Law, which provides that when inmates "disobey any lawful direction, the officers and employees shall use all *suitable means* to defend themselves, to maintain order, to enforce observation of discipline, to secure the persons or the offenders and to prevent any such attempt or escape." (Def. Mem. at 21) (citing New York State Corrections Law §137.5.) They also provided excerpts from New York State Penal Law, Article 35.10, which provides that "a warden or other authorized official of a jail, prison or correctional institution may, in order to maintain order and discipline, use such physical force as is authorized by the correction law." (*Id*. at 21-22). They similarly provide excerpts from the Rockland County Sherriff's Office Policies ("RCSO"), which provides that officers may use pepper spray when they are authorized to do so in a manner that is reasonable, necessary, and safe—*after* they have tried communicating orders verbally. (*See* Def. Mem. at 23; Blasko Affidavit, Ex. L). And lastly, they also provided expert testimony of Dominick Blasko, a Chief Police Officer for the Town of Crawford who is a Master Instructor on the administration of pepper spray, who upon reviewing all the evidence and regulations that apply to RCCF, testified that St. Mueller's "use of force through administration of OC (pepper) spray was reasonable and necessary and in accordance with good and accepted correctional industry standards.") (Expert Affidavit, Dominick Blasko, Ex. K, ECF No. 110-20.)

The Court thus finds that Defendants' were within their right to judge Plaintiff as a suicide risk The facts show that it is within RCCF officers' authority to preliminarily judge inmates' state of well-being and strive to effectuate their proper placement within the correctional facility. They also show that it is within their authority to maintain order and discipline within the facility. It is inevitable that inmates will occasionally refuse to obey the authority of officer commands or disagree with their judgments. In such instances, officers need to resort to pressure tactics of some

sort to instill order. "[T]he question… ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.") *Hudson*, 503 U.S. at 6 (citations omitted.)

It is not within the Court's province to write or advocate particular rules in the prison system. The Court's job is to ensure that when an individual loses certain liberty interests as a penalty for committing offenses against society, that individual is not deprived of the "concepts of dignity, civilized standards, humanity, and decency" that animate the Eight Amendment. *Id*. at 12 (citing *Estelle*, 429 U.S. at 102; *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968)). Here, even if Defendants were chiding or bullying Plaintiff more than was strictly necessary, their conduct did not egregiously depart from the aim of maintaining order, and it did not encroach the realm of violating Plaintiff's dignitary interests. Consequently, this factor weighs in favor of Defendants.

## iv. *Correlation between that need and the Amount of Force Used*

The correlation between the need for force and the amount of force used is a factor that goes to the principle proportionality. It too requires asking whether or not the measure taken inflicted disproportionate pain and suffering, and whether the force exposed the prisoner to a "sufficiently substantial risk of serious damage to his future health" *Farmer*, 511 U.S. at 843 (internal quotation marks omitted). For example, in *Farmer*, a case about a transsexual inmate who was subjected to rape by other inmates, the Supreme Court explained that even though conditions may be restrictive and harsh, it is disproportionate to gratuitously allow "the beating or rape of one prisoner by another" as such conduct "serves no penological objective" any more than it "squares with evolving standards of decency." *Id*. at 833. The Court explained that "being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offense against society." Similarly, in *Hudson*, the Supreme Court explained the proportionality concept

in its reasoning when it explained: "[t]o deny… the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the concepts of dignity, civilized standards, humanity, and decency that animate the Eight Amendment" *Hudson*, 503 U.S. at 11 (internal quotation marks omitted.)

Here, the undisputed facts show that the length of pepper spraying is not in dispute. (*Compare* Def. Mem. at 12: "the OC spray was only administered one time in a single short burst" *with* Pl. Dep. 50:1-5: "Q: And do you recall about how long you were actually sprayed in the face? A: About—for a couple of seconds.") At the same time, there is a dispute about the quantity of pepper spray that was emitted and the proximity of St. Mueller to Plaintiff's face. Plaintiff testifies that "[h]e was so close to my face, his fingers was touching my nose while he sprayed me with the thing. And after he did it—after he did it, ... he just left while I was in the shower. I was in the shower breathing the whole thing. It was so strong." (Pl. Dep 47:21-23, 48:1-4.) Although Plaintiff offers no facts to corroborate his testimony, none of Defendants' evidence fully belies Plaintiff's statement. At best, Defendants' surveillance video shows that the duration of the spray was short because Plaintiff emerged from the shower within a few seconds of being sprayed, and did not appear to be in excruciating pain. (*See* Ex. O). Because the video does not depict what happened in the shower, the Court cannot assess how close the pepper spray was to Plaintiff's eyes, only that it could not have been close enough to cause immediate, debilitating pain and suffering.

Because there are still questions about exactly how close St. Mueller held the pepper spray from Plaintiff's eyes, this factor is not fully assessable by the Court and weighs neither in favor of Plaintiff nor Defendants. The Court simply notes that the effects of the injury are minor, and whatever force was applied, was not applied for long.

*v.* *Threat reasonably Perceived by the Defendants*

The undisputed facts show that the threat that Plaintiff would cause physical harm was slight, as Plaintiff was not being violent or belligerent—rather, he was just getting increasingly agitated. (*See supra* Part I.A.) ("…yes I did ask[] him a couple of times again to talk to the doctor and the chaplain maybe that's the reason he got so mad…"). Indeed, the surveillance video corroborates that while Plaintiff was getting a little more animated, he was always unarmed, and never created any dire chaos, such as by trying to flee, attack, or do anything that could objectively or subjectively be perceived as a threat to Defendants' safety.

Here, the Court cannot find that a confined inmate, who was unarmed and not behaving violently, was posing much of a physical threat to Defendants' safety or well-being. He was, however, posing a modest threat of disorder in an environment where he had no right to do so and where maintenance of civility and discipline is of utmost importance. Accordingly, this factor minutely weighs in Defendants' favor.

vi. *Efforts Made by the Defendants to Temper the Severity of a Forceful Response*

Lastly, the Court finds that Defendants did make several good-faith efforts to temper the severity of the situation before resorting to a forceful response. The surveillance video depicts that before Officer Mueller arrived on the scene, Officer Puccio was talking to Defendant. (*See* Ex. O). When Officer Mueller arrived, talking to Plaintiff for a few minutes before leading Plaintiff into the shower stall and offered Plaintiff the blue suit several times by holding it out towards him. (*Id.*) Indeed, Plaintiff himself admits that he was asked to change into the blue suit multiple times, but he kept resisting because he wanted to first speak to the nurse or chaplain. *See* Pl. Dep. at 46: 15-23 ("He was just – he was – he was talking to me in a really loud voice and I don't know – just it really – it wasn't necessary the things he was saying. And I just – I was just trying to make sure

that he understood where I was coming from too. I said please, please, you know, please, please, please Sergeant Mueller, let me speak to the doctor, please.").

The Court finds that Defendants tried multiple times to convince Plaintiff to follow their orders and change apparel before resorting to use of force. Although reasonably minds might disagree on whether Plaintiff's or the Defendants' request was reasonable, the Court finds that the undisputed facts reflect that Defendants made at a sufficient effort to temper the need to use force before deploying it. Accordingly, this factor weighs in favor of Defendants.

*　　　*　　　*

On the balance, the Court finds that the undisputed facts related to the subjective test indicate that Defendants did not have the requisite culpable state of mind, and although these is no video footage showing the exact interaction in which St. Mueller sprayed Plaintiff, there is no other fact on the record that could allow a jury to find a *mens rea* of deliberate indifference, recklessness, or knowing willingness of a serious risk of harm. Accordingly, Defendants' have met their burden of proof with regards to the subjective test, and the Court next turns to the objective test.

### b. Objective Test

Again, the objective test focuses on the harm done in light of "contemporary standards of decency," *Wright*, 554 F.3d at 268, and asks whether the alleged violation is "sufficiently serious" to warrant Eighth Amendment protections. *Blyden*, 186 F.3d at 262; *Davidson v. Flynn*, 32 F.3d 27, 29–30 (2d Cir.1994). As with the subjective test, due consideration must be given to the circumstances in which the force was applied, including "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted." *Whitley v. Albers*, 475 U.S. 312, 321, 106 S.Ct. 1078 (internal brackets and cite omitted).

And although not dispositive, "[t]he absence of serious injury is ... relevant to the Eighth Amendment inquiry...." *Hudson,* 503 U.S. at 7, 112 S.Ct. 995.

The Court has already detailed above the many reasons why the extent of Plaintiff's injury is minor for the purpose of assessing Defendants' motive. (*Supra* Part III.A.1.a.) There is no need for the Court to rehash its analysis about the lack of causation between the pepper spray incident and Plaintiff's loss of vision, subsequent retina surgery, and various eye and body pains.

Absent any proof of a causal relationship between Plaintiff's numerous alleged injuries and the pepper spray incident, the Court holds that no reasonable juror could find that St. Mueller or the other officers' conduct was such a grave departure from "contemporary standards of decency" or that Plaintiff's injury was serious enough to invite an Eighth Amendment violation.

## 2. Deprivation of Toiletries, Belongings and Recreation

Plaintiff's second claim is that whilst he was intake for two weeks, he was "locked" for fourteen days, and in the first four or five of those days, he was left "with no recreation, no shower, no toothbrush, [and] no toilet paper." (8/14/14 Letter.) Plaintiff also mentions that prior to being sent to intake, his belongings were taken, (*See* AC Att. A) ("…they took all my stuff [put] them in the trash my legal papers my bible my clothes my commissary everything that I had owned. They took it all. I never got them back.") And he complains about missing one appointment to get his medicines when he was first sent to intake. (*See* 8/14/14 Letter.)[6]

Defendants argue that there are no facts on the record that support Plaintiff's position and that, even if Plaintiff's allegations were taken as true, there is no Eighth Amendment violation for

---

[6] "They open my cell door a couple of times, I even hear them in the lo[ud] speaker saying Beauvoir Medical. But he did not escort me for my medicine so they just lock my cell door because C/O Pereze was too busy joking with the officers on the high level. I tried calling for C/O Pereze many times then he finally show up. I told him that I need my medicine[e] he looked at his watch he said it was too late. I tried asking him for toilet paper and toothbrush he rather curse me out." (8/14/14 Letter.)

the type of deprivation that Plaintiff claims to have suffered. (Def. Mem. at 27-28). ("Plaintiff's alleged span of four days without toiletries clearly does not rise to the level of a Constitutional violation.") The Court again agrees with the Defendants.

"[T]he Eight Amendment prohibits imposing unduly harsh penalties that infringe the very dignity of one's humanity." *Johnson v. O'Connel,* Case No. 15-cv-2288, ECF No. 66 (S.D.N.Y. October 17, 2018) (NSR) (listing cases.) An Eight Amendment violation is not triggered by the innate discomforts of being imprisoned. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994)) (holding that the Constitution "does not mandate comfortable prisons" though it does prohibit inhumane ones) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981).)) Nor is an Eighth Amendment violation triggered from a *de minimus* deprivation of hygiene and housing sanitation conditions. *See id.*

As with excessive force claims, claims challenging an inmate's living conditions have two prongs. "To establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,'" and second, that those conditions are unreasonable when "evaluated in light of contemporary standards of decency." *Darnell*, 849 F.3d at 30; *see also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Although the Constitution "does not mandate comfortable prisons" it requires that officials "ensure that inmates receive *adequate* food, clothing, shelter, and medical care, and [] 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (citing *Hudson v. Palmer*, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 3200 (1984)).

Consequently, to defeat summary judgment, the undisputed facts on the record must show "objectively, sufficiently, serious . . . denial of the minimal civilized measure of life's necessities." *Willey v. Kirkpatrick*, 801 F.3d 51, 66 (2d Cir. 2015). Where unsanitary conditions are concerned,

courts look at "both the duration and the severity of the exposure." *Id*. at 68; *see also Darnell*, 849 F.3d at 30. As to the second prong, a Plaintiff must demonstrate that prison officials acted "with more than mere negligence." *Walker*, 717 F.3d at 125 (quoting *Farmer*, 511 U.S. at 835) (internal quotations omitted). Further, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson*, 503 U.S. at 9.

Here, the undisputed facts do not satisfy either prong. Beginning with the objective test, Plaintiff has only alleged that he was deprived of toiletries, such as a toothbrush and toilet paper, for four to five days. (8/14/14 Letter.) He similarly claims that he was only deprived of the ability to shower and have recreation for that amount of time. (*Id*.) His fleeting allegation about medicine is not corroborated by any evidence on the record, but at best, only reflects that he was deprived of medication on one instance whilst he was in intake. (*Id*.) Deprivations of such mild duration and severity do not rise to the level of being considered cruel and unusual treatment under the Constitution. *See e.g.*, *Dillon v. City of New York*, No. 12 CIV. 7113 LAP, 2013 WL 6978959, at *3 (S.D.N.Y. Nov. 18, 2013) ("Courts [in this Circuit] are extremely reluctant ... to find constitutional violations based on temporary deprivations of personal hygiene and grooming items.")(citing *Myers v. City of N.Y.,* No. 11 Civ. 8525, 2012 WL 3776707, at *8 (S.D.N .Y. Aug. 29, 2012); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 175–76 (S.D.N.Y.2001)), *aff'd,* No. 12–4032, 2013 WL 3603784 (2d Cir. July 16, 2013)); *see also McCoy,* 255 F.Supp.2d at 260 (dismissing Eighth Amendment claims as insufficient under the objective test because "a two-week suspension of shower privileges does not suffice as a denial of basic hygienic needs[.]") (internal quotation marks omitted); *Cruz v. Jackson,* No. 94 Civ. 2600(RWS), 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997) (same and collecting cases); *Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003)

(deprivation of toiletries for two weeks does not rise to the level of a constitutional violation). Accordingly, the Court finds that Plaintiff's claim fails the subjective test.

Turning to the subjective test, the Second Circuit has explicitly held that, with respect to conditions of confinement, the defendant-official must have acted recklessly or intentionally. *See Darnell*, 849 F.3d at 35. Negligence will not suffice, *Jackson v. Sullivan Cty.*, No. 16 CIV. 3673, 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018). Undisputed facts aside, Plaintiff does not even sufficiently allege that any of the officers intentionally subjected Plaintiff to the unhygienic conditions or recklessly failed to act when they knew or should have known that the conditions posed an excessive risk to his health or safety. *See id.* (finding lack of similar allegations defective to the claim); *Figueroa v. Cty. of Rockland*, No. 16-CV-6519 (NSR), 2018 WL 3315735, at * 8 (S.D.N.Y. July 5, 2018) (same). At best, Plaintiff's claims regarding state-of-mind include: 1) that after Plaintiff was taken off of suicide watch "they still locked me in for fifteen days"; 2) that at some point, Byran "wasn't doing what he was supposed to do" (8/14/14 Letter); 3) that once Plaintiff was placed in intake, Pereze "was too busy joking with other officers on the high level" to escort Plaintiff once to get his medicine (8/14/14 Letter); and 4) that generally Mueller "has an anger issue" and at various points "was so focus on hurting [Plaintiff]", (10/23/17 Letter). None of these statements, alone or in combination, rise to the level of reflecting a deliberate indifference, a recklessness, or an intentional sense of sadism, sufficient to meet the subjective intent requirement for Plaintiff's claim. For one thing, none of these statements are tied to the hygiene and sanitation issues specifically. Second, Plaintiff never even alleges that the single deprivation of medicine affected him at all, let alone severely, and third, the statements, at best, reflect that the officers were being negligent, not intentionally cruel or reckless.

Despite Plaintiff's *pro se* status, Plaintiff's claims are just the type of "bald" assertions that are unsupported by any evidence. *Shariff*, 689 F.Supp.2d at 476. Hence, neither the subjective nor ojective test requirements are not met, and accordingly, Plaintiff's claims based on the deprivations he suffered while he was in the lock-in cannot withstand summary judgment.

### B. Qualified Immunity

Lastly, Defendants argue that, even if Plaintiff's constitutional claims were to survive summary judgment, they are entitled to qualified immunity because "it was objectively reasonable for Sgt. Mueller to apply minimal force necessary through the administration of OC spray after plaintiff repeatedly refused orders from multiple officers and became visibly animated and agitated."(Def. Mem. at 30.) Once again, the Court agrees with Defendants.

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Government actors performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). The immunity protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 107 S. Ct. 3034, 3039 97 L. Ed. 2d 523, 640 (1987). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 340-41 106 S. Ct. 1092, 1096 89 L. Ed. 2d 271 (1986)).

The Court finds that there are just enough facts for the Defendants' motion for summary judgment to be granted on the qualified immunity argument. Certainly, when critical facts are in dispute, regarding the need for force in a given situation, courts must deny summary judgment. (*See e.g.*, *Busch v. City of New York*, No. 00 CV 5211(SJ), 2003 WL 22171896 (E.D.N.Y. Sept. 11, 2003) (finding that there were "too many disputed facts" that played into the issue of whether Defendant's use of pepper spray was excessive). That is not the case here.

Here, the Court already explained that the officers were charged with maintaining order in the correctional facility and were allowed to use their judgment to assess the well-being of the inmates. Indeed, it was in their prerogative to ensure that inmates who were deemed to be at risk of self-harm were placed on suicide watch. The officers necessarily have to base their decisions on judgments that they make in the moment that are inherently subjective. Plaintiff was on his knees weeping when he was first placed on suicide watch. (*See supra* Part I.A.) He subsequently acted difficult and repeatedly denied verbal offers to change his clothes and proceed to intake. (*Id*.) As the Court stated earlier, it may not have been strictly necessary or desirable for Defendants' to resort to using force to ensure Plaintiff's compliance, but certain "situations may require prison officials to act quickly and decisively," *Hudson*, 503 U.S. at 6. Further, the Supreme Court encourages courts to afford prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain security" *Id*.

The Court finds that the facts on the record reflect that it was objectively reasonable for St. Mueller to believe his actions were lawful at the time he acted. Accordingly, the Court finds that, in addition to their not being a constitutional violation under the Eighth Amendment, Defendants have adduced enough evidence to show that they are entitled to qualified immunity.

### C. Claims Against Other Named Officers

Plaintiff loosely brings claims against other named officers as well, including: Sherriff Falco, Lt. Byran, Sgt. Hickey, C/O Pereze, and C/O Levine. (See 8/14/14 Letter, Att. A.) Though it is a bit nebulous which claims Plaintiff is alleging against whom, Defendants seek to dismiss each of these claims on the basis that they are either inadequately pleaded or are moot. (Def. Mem. at 33-34.) The Court agrees with Defendants.

#### 1. Grievance Claims Against Byran, Hickey, and Levine

Plaintiff vaguely raises claims against Levine, Hickey and Byran, each of whom allegedly told Plaintiff that his complaint was not grievable. (*See* 8/14/14 Letter) ("The first time I asked [Levine] he said he was going to call the Sgt. for me but he did not. I waited for a few more days I asked him again he ignored me. I waited again to ask him about the situation, then he told me my complaint was not grievable. He did not call the Sgt. for me."); ("When I asked [Byran] for the grievance he brought [it] right away but he acted like he never knew about the situation because after I told him what happened to me he says I don't believe it, I don't believe it. Sgt. Hickey never give you the grievance.")

Defendants argue that Plaintiff does not plead a cognizable claim against any of the officers for being advised that his claim was not grievable, and that in any event, the claim is moot because Plaintiff was ultimately able to file his formal grievance. (Def. Mem. at 33-34.)

The Court finds that any claim against any of the officers, asserting that they violated Plaintiff's constitutional rights by interfering with the grievance process cannot stand. "[I]nmate grievance programs created by state law are not required by the Constitution." *Rickett v. Orsino*, No. 10-CV-5152, 2013 WL 1176059, at *20 (S.D.N.Y. Feb. 20, 2013), *report and recommendation adopted by*, 2013 WL 1155354 (Mar. 21, 2013). Thus, a claim alleging

interference with the grievance procedures is not cognizable under Section 1983 "absent a showing that the defendants' actions in that regard result in actual prejudice to the inmate's pursuit of a legal action," *Abney v. Jopp*, 655 F. Supp. 2d 231, 234 (W.D.N.Y. 2009); *see also Banks v. Cnty. of Westchester*, 168 F. Supp. 3d 682, 692 (S.D.N.Y. 2016) (noting that plaintiff must demonstrate that "defendant's actions resulted in an actual injury").

Here, Plaintiff's conclusory allegations fail to demonstrate that he was actually prejudiced in the pursuit of any legal action. He was able to file a formal grievance and have his complaint go through the full grievance process at RCCF. (*See* Pl. Dep., Ex. C, at 182; Ex. D at Def.000017-000022). Subsequently, he successfully pursued this Section 1983 action in federal court, and this Court is permitting Plaintiff to re-allege his claims against any officers that concern the cruel and unusual treatments that were central to his grievance. Consequently, as a matter of law, Plaintiff's access to the court claims cannot stand. *Figueroa*, 2018 WL 3315735, at * 8.

## 2. Inadequate Supervision Claims Against Falco and Byran

Defendants argue that it is not clear what claims Plaintiff is raising against Falco and Byran. (Def. Mem. at 33.) At best, Defendants construe Plaintiff's claims as failure to supervise claims, which they argue, must be dismissed on the pleadings. The Court agrees.

Beginning with the allegations against Lt. Byran, in "Attachment A" of his Amended Complaint, Plaintiff argues that "being a Lt. is like being a supervisor. He should be the one making sure that everything goes right in the jail. He should be the one to make sure all C/Os and Sgts. are doing their Job…. that's his job to know what goes down in the facility. [I]f by chance Lt. Byran

admit that he did not know about the situation that means he definitely wasn't doing what he was supposed to do what he was hired to do." (*See* AC Att. A.)

Similarly, with regards to Sheriff Falco, Plaintiff claims that "the Sherriff Department is in charge of the county jail. [Be]cause of them, I can't get my sight the way it was before. After the situation happen they took all my legal papers, my bible, my clothes, all the food I brought from commissary at least forty dollars' worth of food or more." (*Id*.) Plaintiff added, "I complain to the C/Os and Sgts. they all said they cannot find my stuff or even buy them back. Rockland County jail do whatever they want because no one is doing anything about it not even the sheriff department." *(Id*.)

The Court, like Defendants, reads the claims against Falco and Byran as claims for failure to supervise. To plead a claim for supervisor liability in § 1983 actions, a plaintiff must allege:

> (1) The defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Here, even interpreting *pro se* Plaintiff's Amended Complaint liberally, the Court finds that Plaintiff's pleadings are wholly insufficient to make out claims for failure to supervise for either of these named defendants. Regarding Lt. Bryon, all that Plaintiff seems to be alleging is that Bryon did not know about the pepper spray incident and should therefore be liable. This does not satisfy even the first element for supervisory liability, which is direct involvement. Plaintiff certainly makes no mention of a policy or custom or anything that could color claims of deliberate indifference or a grossly negligent mindset. Accordingly, this claim is dismissed.

As to Sherriff Falco, Plaintiff's claims are equally as vague and deficient. With Plaintiff's claim that "I complain to the C/Os and Sgts. they all said they cannot find my stuff or even buy them back. Rockland County jail do whatever they want because no one is doing anything about it not even the sheriff department," the Court finds that it fails as a matter of law because an inmate's allegation that an official ignored a written protest or request is insufficient to establish personal involvement. *Platt v. Incorporated Village of Southampton*, 391 F. App'x 62, 65 (2d Cir. 2010) (holding that allegations that a supervisor ignored a letter protesting unconstitutional conduct was insufficient to establish that the supervisor was personally involved). Consequently, both of these claims are insufficiently plead, and all of Plaintiff's complaints against individual officers are dismissed.

## CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgment is GRANTED in its entirety, and all claims in this action against all named Defendants are DISMISSED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 110, terminate the case, and to enter judgment in favor of Defendants. The Clerk of the Court is additionally directed to mail a copy of this order to Plaintiff at his last known address on ECF, and show proof of service on the docket.

SO ORDERED.

Dated:    November 5, 2018
          White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge